RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 17a0220p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

ISLAMIC CENTER OF NASHVILLE,

*Plaintiff-Appellant*,

*v.*

STATE OF TENNESSEE; CHARLIE CALDWELL; TENNESSEE STATE BOARD OF EQUALIZATION,

*Defendants-Appellees*.

No. 17-5045

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 3:16-cv-02498—Aleta Arthur Trauger, District Judge.

Decided and Filed:  September 20, 2017

Before:  MERRITT, MOORE, and ROGERS, Circuit Judges.

_____

## COUNSEL

**ON BRIEF:**  Charles D. Swift, Christina A. Jump, CONSTITUTIONAL LAW CENTER FOR MUSLIMS IN AMERICA, Richardson, Texas, for Appellant.  Mary Ellen Knack, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellees.

_____

## OPINION

_____

KAREN NELSON MOORE, Circuit Judge.  This case arises from a property tax assessed against an otherwise-tax-exempt religious nonprofit, the Islamic Center of Nashville (ICN), for a period of time during which it had formally transferred title to a bank through a financing vehicle called an *ijara* agreement that complies with Islamic doctrine.  After ICN

regained title to the property, it asked the Tennessee State Board of Equalization to apply its tax exemption retroactively to cover the period of time during which the bank had held title to the property, but both an Administrative Law Judge and then the State Board's Assessment Appeals Commission denied ICN's requests. The Tennessee statute governing tax appeals names the appropriate state chancery court as the next step for obtaining judicial review after these administrative adjudicators have first addressed the case. Because ICN instead filed suit in federal court, leveling a range of constitutional, federal statutory, and state statutory claims that would (on its theory) vitiate its obligation to pay taxes of the kind assessed, and because Tennessee's statutory provision for state-court appeal provides a plain, speedy, and efficient alternative to federal-court review, the Tax Injunction Act bars ICN's suit in federal court. Therefore, we **AFFIRM** the judgment of the district court dismissing ICN's case for lack of subject-matter jurisdiction.

## I. BACKGROUND

The plaintiff-appellant in this case, ICN, is a duly credited religious nonprofit that operates both a mosque and a school in Nashville, Tennessee. R. 1 (Compl. ¶ 4.1–4.3) (Page ID #2); R. 1-5 (Compl. Ex. E, Letter to Charlie Cardwell) (Page ID #47–48). In August 2008, it commenced construction on a new school building, which it financed by entering into an *ijara* agreement[1] with a bank, whereby it could "borrow money without running afoul of the Islamic prohibition on the payment of interest." R. 1 (Compl. ¶ 4.5–4.7) (Page ID #3). Under the terms of the agreement, the bank essentially bought the property from ICN, leased it back to ICN, and then ultimately sold it back to ICN, with the lease payments serving the function that would otherwise have been served by interest payments. *See* R. 1 (Compl. ¶ 4.6–4.8) (Page ID #3); R. 1-3 (Compl. Ex. C, ALJ Initial Decision & Order) (Page ID #36–37). The *ijara* agreement lasted from August 2008 to October 2013, during which time the property was "continuously occupied by [ICN] and physically used solely for exempt religious educational purposes." R. 1-3 (Compl.

---

[1]"Similar to Western lease financing, an *ijara* agreement is a leasing arrangement in which a financial institution purchases an asset, retains title, and then leases it to its client," potentially with an "upfront agreement[] in which the client agrees to purchase the asset at the end of the lease term." Alan J. Alexander, *Shifting Title and Risk: Islamic Project Finance with Western Partners*, 32 MICH. J. INT'L L. 571, 593 (2011). This arrangement is necessary for Islamic organizations because "interest, making money from money, . . . is prohibited" under Islamic law. *Id.* at 574.

Ex. C, ALJ Initial Decision & Order) (Page ID #38).  The bank, however, held legal title to the property throughout this period of time.  R. 1 (Compl. ¶ 4.8) (Page ID #3).

Though the *ijara* agreement did not change the use or possession of the property, it did change the ownership, and the 2008 transfer of title from ICN to the bank thus prompted the county's tax assessor to "return[] the property to the tax roll."  R. 1-4 (Compl. Ex. D, Appeals Comm'n Final Decision & Order) (Page ID #43).  When ICN completed its payments in October 2013, it "regained the unencumbered title to the property."  R. 1 (Compl. ¶ 4.11) (Page ID #4); R. 1-2 (Compl. Ex. B, Quit Claim Deed) (Page ID #28–30).  In February 2014, "ICN applied for a property tax exemption regarding [the property], . . . seeking retroactive application."  R. 1 (Compl. ¶ 4.12) (Page ID #4).  The Tennessee State Board of Equalization's designee regranted ICN its exemption, but not for the time during which the bank had held title to the property. R. 1-3 (Compl. Ex. C, ALJ Initial Decision & Order) (Page ID #32).  ICN appealed, and an administrative law judge (ALJ) for the State Board of Equalization heard its appeal in January 2015.  *Id.*; R. 1 (Compl. ¶ 4.14–4.15) (Page ID #4).  In February 2015, though noting that he was not "insensitive to the taxpayer's predicament" and calling the "outcome particularly unfortunate," the ALJ upheld the tax assessment for the period during which the bank held title. R. 1-3 (Compl. Ex. C, ALJ Initial Decision & Order) (Page ID #36, 38–39).

ICN appealed from the ALJ's decision, this time to the State Board's Assessment Appeals Commission.  R. 1 (Compl. ¶ 4.21) (Page ID #5).  In May 2016, the Commission ruled that although it "sympathize[d] with the taxpayer's sincere desire to comply with religious principles, [it was] unable to ignore the legal transfer of title."  R. 1-4 (Compl. Ex. D, Appeals Comm'n Final Decision & Order) (Page ID #44).  It noted that its order was "subject to," among other forms of (discretionary) administrative review, judicial "[r]eview by the Chancery Court of Davidson County [the county in which Nashville is located] or other venue as provided by law." *Id.*

ICN did not seek review in the Tennessee chancery court, and, as it acknowledged in its Complaint in this case, "[t]he decision of the Assessment Appeals Commission became final June 16, 2016."  R. 1 (Compl. ¶ 4.25) (Page ID #6).  Instead, ICN filed suit in federal court in September 2016 against the State of Tennessee, the Tennessee State Board of Equalization, and

Charlie Cardwell,[2] the Metropolitan Trustee of Davidson County.  In its suit, ICN alleged causes of action under the federal Religious Freedom Restoration Act (RFRA) "and its Tennessee Counterpart"; the federal Religious Land Use and Institutionalized Persons Act (RLUIPA); the federal Elementary and Secondary Education Act of 1965; and the First Amendment's Establishment Clause.[3]  R. 1 (Compl. ¶¶ 5.1–5.21) (Page ID #7–12).  ICN sought damages, as well as "preliminary and permanent injunctive and declaratory relief."  R. 1 (Compl. ¶¶ 6.1–6.6) (Page ID #13).

In October 2016, the state parties (the State) moved to dismiss for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), citing (among other arguments) the federal Tax Injunction Act, 28 U.S.C. § 1341.[4]  R. 13 (Mem. in Support of Mot. to Dismiss) (Page ID #74).  In December 2016, the district court granted the State's Rule 12(b)(1) motion on that ground.  R. 27 (Dist. Ct. Mem.) (Page ID #146).  ICN timely appealed.

## II.  DISCUSSION

This appeal raises two issues:  First, whether the district court was correct to dismiss ICN's claim for lack of subject-matter jurisdiction on the ground that it was barred by the Tax Injunction Act (TIA).  And second, whether the district court abused its discretion by dismissing ICN's case without giving ICN leave to amend.  For the reasons that follow, the district court was correct to dismiss the case as barred by the TIA and there was no abuse of discretion.

---

[2]There is some discrepancy in the record regarding the spelling of Trustee Cardwell's name.  *Compare* R. 1 (Compl.) (Page ID #1–2) ("Caldwell"); R. 30 (Pl.'s Mot. to Vacate J.) (Page ID #149–51) ("Caldwell"), *with* R. 1-5 (Compl. Ex. E, Letter to Charlie Cardwell) (Page ID #47) ("Cardwell").  Because independent sources indicate that the correct spelling is "Cardwell," *see Office of the Trustee*, NASHVILLE.GOV, http://www.nashville.gov/Trustee.aspx (last visited Sept. 11, 2017), we use that spelling here.

[3]Though the Complaint does not expressly state a claim under the Free Exercise Clause, it can be fairly read as doing so.  *See* R. 1 (Compl. ¶ 5.16) (Page ID #11) ("These actions are a violation of the Establishment [C]lause of the First Amendment and unlawfully infringe upon Plaintiff's right to observe the tenets of its religious practice and restrictions.").  For the reasons elaborated below, however, this question does not affect the outcome here.

[4]The State also moved to dismiss under Federal Rule of Civil Procedure 12(b)(6).

## A.  Standard of Review

"This Court reviews *de novo* the dismissal of a complaint under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction." *Colonial Pipeline Co. v. Morgan*, 474 F.3d 211, 217 (6th Cir. 2007).

## B.  The Tax Injunction Act

This appeal hinges on whether the federal Tax Injunction Act (TIA), 28 U.S.C. § 1341, bars a federal court from hearing ICN's claims.  The TIA states:  "The district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State."  28 U.S.C. § 1341.  This prohibition, the Supreme Court has explained, "has its roots in equity practice, in principles of federalism, and in recognition of the imperative need of a State to administer its own fiscal operations."  *Tully v. Griffin, Inc.*, 429 U.S. 68, 73 (1976); *cf. Dows v. Chicago*, 11 Wall. 108, 110 (1871) (Field, J.) ("[I]t is of the utmost importance to [the States] that the modes adopted to enforce the taxes levied should be interfered with as little as possible.").  The TIA has accordingly been understood as reflecting "the fundamental principle of comity between federal courts and state governments that is essential to 'Our Federalism,' particularly in the area of state taxation."  *Fair Assessment in Real Estate Ass'n v. McNary*, 454 U.S. 100, 103 (1981).

The prohibition also has roots in the evolution of the Supreme Court's own doctrine.  In the years following the Court's holding in *Ex parte Young*, 209 U.S. 123 (1908), "that federal courts *may* enjoin state officers from enforcing an unconstitutional law, Congress also recognized that the autonomy and fiscal stability of the States survive best when state tax systems are not subject to scrutiny in federal courts."  *Fair Assessment in Real Estate Ass'n*, 454 U.S. at 102–03; *see also Hibbs v. Winn*, 542 U.S. 88, 104–05 (2004) ("In short, in enacting the TIA, Congress trained its attention on taxpayers who sought to avoid paying their tax bill by pursuing a challenge route other than the one specified by the taxing authority.").  Thus, "[a] federal district court is under an equitable duty to refrain from interfering with a State's collection of its revenue except in cases where an asserted federal right might otherwise be lost."  *Colonial Pipeline*, 474 F.3d at 218 (quoting *Tully*, 429 U.S. at 73); *see also King v. Sloane*,

545 F.2d 7, 8 (6th Cir. 1976) ("The federal courts will not entertain actions for relief from State or local taxes unless federal rights are protected in no other way."). At bottom, this duty "rest[s] on a 'state-revenue-protective' rationale." *Hill v. Kemp*, 478 F.3d 1236, 1249 (10th Cir. 2007) (quoting *Hibbs*, 542 U.S. at 106).

Because the TIA encompasses both (1) a substantive definition of what is prohibited ("enjoin[ing], suspend[ing] or restrain[ing] the assessment, levy or collection of any tax under State law") and (2) a stated condition for its application ("where a plain, speedy and efficient remedy may be had in the courts of such State"), 28 U.S.C. § 1341, we first consider whether the TIA's substantive proscription applies to ICN's claims. We then discuss whether the Tennessee courts meet the TIA's stated condition.

## C. The TIA's Applicability to ICN's Claims

ICN has emphasized in its briefing that ICN "already paid its assessed taxes" and "does not seek relief from this payment," but "instead seeks to have the relevant Tennessee statute struck down as unconstitutional." Appellant's Br. at 2; *see also id.* at 3, 24, 29; Appellant's Reply Br. at 2, 10, 24. Although this framing is in some admitted tension with its Complaint, *see* Appellant's Br. at 19; R. 1 (Compl. ¶ 5.18, 6.1, 6.4) (Page ID #11, 13) (discussing the burden at issue and seeking damages, costs, and expenses involved), we will assume, granting ICN the benefit of the doubt, that ICN is seeking only prospective "declaratory and injunctive relief" against Tennessee's tax law, Appellant's Br. at 3, 29.**[5]**

The Tax Injunction Act encompasses these remedies. The Act "is jurisdictional and prevents federal courts from awarding declaratory or injunctive relief to plaintiffs who challenge state tax laws." *Wayside Church v. Van Buren Cty.*, 847 F.3d 812, 822 (6th Cir. 2017). And although the TIA's language formally encompasses only injunctive relief, the Supreme Court has

---

**[5]**This characterization is understandable: Seeking to avoid the previously assessed tax would fall more squarely under the plain text of the TIA, while suing for money damages under 42 U.S.C. § 1983 would be barred at least under the comity doctrine, if not also by the TIA. *See Fair Assessment in Real Estate Ass'n v. McNary*, 454 U.S. 100, 107 (1981) ("§ 1341 and our comity cases have thus far barred federal courts from granting injunctive and declaratory relief in state tax cases. Because we decide today that the principle of comity bars federal courts from granting damages relief in such cases, we do not decide whether that Act, standing alone, would require such a result.").

clarified that its prohibition applies to declaratory judgments as well. *California v. Grace Brethren Church*, 457 U.S. 393, 411 (1982) ("[B]ecause Congress' intent in enacting the Tax Injunction Act was to prevent federal-court interference with the assessment and collection of state taxes, we hold that the Act prohibits declaratory as well as injunctive relief.").

It is also clear that what ICN is seeking to avoid is substantively what the TIA addresses: the "assessment" of a tax. Although "assessment," in the TIA's terms, is not "synonymous with the entire plan of taxation," *Hibbs*, 542 U.S. at 102, it is "closely tied to the collection of a tax"— that is, the "official recording of liability that triggers levy and collection efforts," *id.* at 101. In other words, the term fits with the TIA's "state-revenue-protective moorings," *id.* at 106, and the TIA's purpose of preventing state taxpayers from obtaining "federal-court orders enabling them to avoid paying state taxes," *id.* at 107.

ICN's claims fall under this definition. By "assert[ing] claims . . . seeking to declare the tax statute in Tennessee unconstitutional as to application of property tax exemptions for religious non-profit entities," Appellant's Br. at 2–3, ICN seeks to prevent or invalidate the assessment of a tax. Though we may well credit ICN's statements that it "already paid its assessed taxes" and "does not seek relief from this payment," Appellant's Br. at 2, what ICN seeks at bottom is a court order that would allow it (and others) to avoid a future tax, like the one arising from the *ijara* agreement here, from being assessed against it. *See, e.g.*, Appellant's Br. 7–8 (describing ICN's claims as "challenges to the Tennessee statute's exclusion of an interest-free, Islamically complaint *Ijara* loan agreement as a tax-exempt transaction"). If a district court were empowered to hear these claims and rule for ICN, it would be able to issue "federal-court orders enabling [ICN] to avoid paying state taxes." *See Hibbs*, 542 U.S. at 107. Doing that is exactly what the TIA proscribes. *Id.*

ICN's recharacterization of its claims for relief as wholly "prospective," Appellant's Reply Br. at 20, does not change the outcome of this case. Though the Supreme Court has found the TIA inapplicable to a suit for prospective relief when *other* considerations brought that suit outside the TIA's ambit, *see Hibbs*, 542 U.S. at 99–100 (noting that the relief plaintiffs sought was "prospective," *id.* at 99, and then proceeding to the *decisive* question of whether the tax-credit invalidation sought by plaintiffs was an "'assessment' as employed in the TIA," *id.* at

100"), the Court has not hesitated to apply the TIA to other suits encompassing prospective relief in which the TIA otherwise applies. *See, e.g.*, *Grace Brethren Church*, 457 U.S. at 408 ("[B]ecause there is little practical difference between injunctive and declaratory relief, we would be hard pressed to conclude that Congress intended to prohibit taxpayers from seeking one form of anticipatory relief against state tax officials in federal court, while permitting them to seek another . . . ."); *see also Laborde v. City of Gahanna*, 561 F. App'x 476, 479 (6th Cir. 2014) (observing that the TIA bars federal-court challenges "in which the taxpayer seeks to avoid a tax obligation" and "the relief sought is prospective"). The declaratory and injunctive relief that ICN is seeking thus falls within the scope of the remedies that the TIA proscribes.

The fact that ICN is seeking to challenge the constitutionality of a state's tax law under (among other authorities) the First Amendment does not lift its claims over these barriers. The Supreme Court has explicitly rejected the idea of a special exception to the Tax Injunction Act for First Amendment claims, and the case in which it did so, *California v. Grace Brethren Church*, 457 U.S. 393 (1982), illustrates why ICN's claims here are barred from federal court. The plaintiffs in *Grace Brethren Church* were "California churches and religious schools" who sued under the First Amendment's Establishment and Free Exercise Clauses both "to enjoin the Secretary of Labor from conditioning his approval" of California's unemployment-insurance program on its covering (and thus triggering tax liability for) their employees and "to enjoin the State from collecting both tax information and the state tax." *Id.* at 398. Reasoning that Congress did not "intend[] [to] disrupt state tax administration when state refund procedures are available," the Court "decline[d] to find an exception in the Tax Injunction Act for the appellees' claims." *Id.* at 417. "Carving out a special exception for taxpayers raising First Amendment claims," the Court explained, "would undermine significantly Congress' primary purpose 'to limit drastically federal district court jurisdiction to interfere with so important a local concern as the collection of taxes.'" *Id.* at 416–17 (quoting *Rosewell v. LaSalle Nat'l Bank*, 450 U.S. 503, 522 (1981)).

To argue that its suit is not subject to the TIA, ICN also points us to the Supreme Court's decision in *Hibbs v. Winn*, 542 U.S. 88 (2004). But a careful consideration of *Hibbs* and a commonsense reading of ICN's submissions make clear why this argument fails. While *Hibbs*

does make clear that the TIA is not a "sweeping congressional direction to prevent federal-court interference with all aspects of state tax administration," 542 U.S. at 105 (citations and quotation marks omitted), *Hibbs* was a case in which the plaintiffs were *not* "contest[ing] their own tax liability," whether present or future, or "seek[ing] to impede Arizona's receipt of tax revenues," *id.* at 93. Rather, the *Hibbs* plaintiffs were Arizona taxpayers challenging an Arizona law that provided a tax *credit* to taxpayers who donated money to nonprofit organizations that would in turn "direct[] moneys, in the form of scholarship grants, to students enrolled in private elementary or secondary schools." *Id.* at 94–95. The *Hibbs* plaintiffs' problem with this arrangement was that the nonprofits could allow donors to direct their donations to "schools that provide religious instruction or that give admissions preference on the basis of religion or religious affiliation," *id.* at 95—meaning that Arizona taxpayers could get a tax credit for donating to a religious institution, in asserted violation of the Establishment Clause, *id.* at 94. The *Hibbs* plaintiffs therefore sought an injunction prohibiting the State from "allowing taxpayers to utilize the tax credit authorized . . . for payments" directed toward religious schools. *Id.* at 99. In other words, the *Hibbs* plaintiffs did not want Arizona to tax them less, but rather they wanted the state to tax others more. *See id.*; *see also BellSouth Telecommunications, Inc. v. Farris*, 542 F.3d 499, 501–02 (6th Cir. 2008) (demonstrating that the Court has "permitted lawsuits that do not seek to avoid paying taxes" and "barred lawsuits that do").

There is no sensible way to fit ICN's claims into *Hibbs*'s allowable form. In a commercial setting, for example, it might make sense for a competitor to challenge a state scheme for the purpose of increasing a competitor's taxes rather than decreasing its own. *See, e.g., Levin v. Commerce Energy, Inc.*, 560 U.S. 413, 417 (2010). But ICN is a religious nonprofit, and the record discloses that the taxes assessed in this case were regrettably burdensome. *See* R. 1-5 (Compl. Ex. E, Letter to Charlie Cardwell) (Page ID #47–48). To read ICN as seeking to strike down the whole statute not to decrease its own taxes, but rather to ensure that all exempt organizations have to pay the equivalent taxes—say, for using non-title-transferring financing vehicles like standard mortgages—would require not only a massive disruption of Tennessee's tax system, but also visiting a similarly large burden on all exempt Tennessee organizations without assuaging ICN's own burden. It can hardly be said that ICN seeks such an outcome.

Even if we were to understand ICN as seeking such an outcome, Supreme Court comity doctrine would still bar its way. As the Court has made clear, the comity doctrine, which is "more embracive than the TIA," *Levin*, 560 U.S. at 424, "precludes the exercise of original federal-court jurisdiction" to hear "a taxpayer's complaint about allegedly discriminatory state taxation framed as a request to increase a competitor's tax burden," *id.* at 425–26. As the Court explained:

> If lower federal courts were to give audience to the merits of suits alleging uneven state tax burdens, . . . recourse to state court for the interim remedial determination would be unavailable. That is so because federal tribunals lack authority to remand to the state court system an action initiated in federal court. Federal judges, moreover, are bound by the TIA; absent certain exceptions, the Act precludes relief that would diminish state revenues, even if such relief is the remedy least disruptive of the state legislature's design.

*Id.* at 428 (citation omitted). Courts sympathetic to plaintiff's claims, in other words, would have to eschew "the most obvious way to achieve parity" (granting the plaintiff a reduction) and instead pursue the "more ambitious solution" of "reshap[ing] the relevant provisions of [a state's] tax code." *Id.* at 429. "Were a federal court to essay such relief, however, the court would engage in the very interference in state taxation the comity doctrine aims to avoid." *Id.* "In short," as Justice Ginsburg explained, "if [a state's] scheme is indeed unconstitutional, surely [that state's] courts are better positioned to determine—unless and until the [state's] Legislature weighs in—how to comply with the mandate of equal treatment." *Id.*

**D. Availability of a Plain, Speedy, and Efficient Remedy**

That the Tax Injunction Act encompasses ICN's claims is not the end of the inquiry; in order for the TIA to apply, "a plain, speedy and efficient remedy" must also be available to plaintiffs in the relevant state court. 28 U.S.C. § 1341. The Supreme Court construes this exception "narrowly," *Grace Brethren Church*, 457 U.S. at 413, and we have held that "state remedies are plain, adequate, and complete if they provide the taxpayer with a full hearing and judicial determination at which the taxpayer may raise any federal constitutional objections to the tax," *Wayside Church v. Van Buren Cty.*, 847 F.3d 812, 822 (6th Cir. 2017) (quoting *In re Gillis*, 836 F.2d 1001, 1010 (6th Cir. 1988)); *accord Rosewell v. LaSalle Nat. Bank*, 450 U.S. 503, 514 (1981).

We have also held that "the procedures available to challenge [a] tax in the administrative agencies and courts of the State of Tennessee are plain, speedy and efficient." *Wilson v. Bredesen*, 113 F. App'x 70, 71 (6th Cir. 2004). As we explained:

> Tennessee, to start with, gives taxpayers an opportunity for a full hearing at which they may raise constitutional objections to tax statutes. They may appeal a local assessment through agency proceedings in a county board of equalization or in the State Board of Equalization. From there, if still dissatisfied, they may seek judicial review of a final decision in state court. This judicial review (in the trial court and in the appellate courts) covers both "the resolved issues and [] those issues that the agency refused or was without authority to consider," including questions of "the constitutionality of a statute regardless of whether [they were] raised at the agency level."

*Id.* at 73 (citations omitted); *see also* Tenn. Code Ann. § 67-5-1511 (providing that "[t]he action of the state board of equalization shall be final and conclusive as to all matters passed upon by the board, subject to judicial review" and that such "judicial review . . . shall consist of a new hearing in the chancery court based upon the administrative record and any additional or supplemental evidence which either party wishes to adduce relevant to any issue").

ICN admits that it "could have chosen to appeal to the Chancery Court," but asserts that "such an appeal was elective and not mandatory." Appellant's Br. at 12. In support of this assertion, it cites the penultimate page of the decision by the State Board of Equalization's Assessment Appeals Commission, which uses the phrase "or other venue as provided by law." *Id.*; *see also* R. 1-4 (Compl. Ex. D, Appeals Comm'n Final Decision & Order) (Page ID #44) ("This Order is subject to: . . . Review by the Chancery Court of Davidson County or other venue as provided by law."). This language, while perhaps unhelpfully open-ended, does not vitiate the fact that Tennessee law explicitly directs appeals to the relevant chancery court, Tenn. Code Ann. § 67-5-1511; in the absence of a conflicting or superseding statutory directive, that is the only venue provided by law, *see* Tenn. Code Ann. § 4-5-322 ("A person who is aggrieved by a final decision in a contested case is entitled to judicial review under this chapter, which shall be the only available method of judicial review. . . . Proceedings for review are instituted by filing a petition for review in the chancery court of Davidson County, unless another court is specified by statute."). ICN's argument, therefore, is unavailing.

Instead, ICN's proper avenue of appeal was in the Tennessee courts. Under our federal "system of dual sovereignty," the Supreme Court has "consistently held that state courts have inherent authority, and are thus presumptively competent, to adjudicate claims" like ICN's that "aris[e] under the laws of the United States." *Tafflin v. Levitt*, 493 U.S. 455, 458 (1990). Here, had ICN appealed to the Tennessee chancery court, it could have then "appealed to the Tennessee Court of Appeals, and ultimately to the Tennessee Supreme Court or to the United States Supreme Court" on the "federal constitutional issues . . . involved." *Colonial Pipeline Co. v. Morgan*, 474 F.3d 211, 219 (6th Cir. 2007).

Though ICN argues that "[f]ederal courts have a 'virtually unflagging' obligation to exercise jurisdiction of properly presented federal constitutional and statutory claims," Appellant's Br. at 17 (quoting *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2347 (2014); *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)), what ICN's framing of this quote obscures is that it is "the virtually unflagging obligation of the federal courts to exercise *the jurisdiction given them*," *Colo. River Water Conservation Dist.*, 424 U.S. at 817 (emphasis added). The TIA removes this jurisdiction for "cases in which state taxpayers seek federal-court orders enabling them to avoid paying state taxes." *Hibbs*, 542 U.S. at 107. To have its constitutional, federal statutory, and state statutory claims considered on the merits, ICN was required under the TIA to bring them to the proper state court.

**E.  Whether the District Court Abused Its Discretion By Dismissing Without Giving ICN Leave to Amend**

ICN further argues that the district court should have given it "leave to amend its pleadings to correct any errors." Appellant's Br. at 8. "Although Federal Rule of Civil Procedure 15(a)(2) provides that a court 'should freely give leave [to amend a complaint] when justice so requires,' the right to amend is not absolute or automatic." *Tucker v. Middleburg-Legacy Place*, 539 F.3d 545, 551 (6th Cir. 2008). As we have observed:

> The district court has discretion in determining whether to permit an amendment, and its decision will be overturned only if it has abused that discretion. Although federal courts are inclined to grant leave to amend following a dismissal order, there are circumstances where amendment will not be allowed. Accordingly, an amendment may not be allowed if the complaint as amended

could not withstand a Fed. R. Civ. P. 12(b)(6) motion.**6**  Furthermore, a district court does not abuse its discretion in failing to grant a party leave to amend where such leave is not sought.

*Sinay v. Lamson & Sessions Co.*, 948 F.2d 1037, 1041–42 (6th Cir. 1991) (citations omitted); *see also Tucker*, 539 F.3d at 551 ("No abuse of discretion occurs when a district court denies a party leave to amend where such leave was never sought."); *Spadafore v. Gardner*, 330 F.3d 849, 853 (6th Cir. 2003) (finding a lack of "'due diligence' required to take advantage of Rule 15(a)'s dictate that leave to amend shall be freely granted" where "[n]o motion for leave to amend was ever filed, . . . nor was a proposed amendment submitted in any form").**7**

Here, there is no indication that ICN ever filed a motion to amend or a proposed amendment with the district court.  *See* R. 19 (Pl.'s Resp. to Def.'s Mot. to Dismiss) (Page ID #96–112); R. 30 (Pl.'s Mot. to Vacate J.) (Page ID #149–52).  Moreover, even granting ICN, as we have, the benefit of the doubt in the clarifications and revisions offered in its appellate briefing, *see* Appellant's Br. at 19–20, our de novo review here leads to the conclusion that ICN's claim is barred from the lower federal courts by the TIA.  In the absence of any indication of a motion to amend or proposed amendment, and where our de novo review indicates that any anticipated amendment would likely be fruitless, we cannot say that the district court abused its discretion.

### III.  CONCLUSION

The Tax Injunction Act prohibits federal courts from hearing claims by taxpayers challenging their obligation to pay state taxes so long as the state provides adequate access to judicial review in state courts.  Because ICN is asking a federal court to free it from tax liability

---

**6**That is, if amendment would be futile.  *See Kreipke v. Wayne State Univ.*, 807 F.3d 768, 782 (6th Cir. 2015), *cert. denied*, 137 S. Ct. 617 (2017) ("A proposed amendment is futile where it would not withstand a motion to dismiss under Fed. R. Civ. P. 12(b)(6) for failure to state a claim.").  "When the district court refuses the plaintiff's request for leave to amend her complaint on grounds of futility, this court reviews de novo because the decision is based on a legal conclusion." *Evans v. Pearson Enterprises, Inc.*, 434 F.3d 839, 853 (6th Cir. 2006).

**7**The problem with the lack of a motion or proposed amendment, we have explained, is that "[w]ithout viewing the proposed amendment, it [is] impossible for the district court to determine whether leave to amend should have been granted." *Spadafore*, 330 F.3d at 853; *see also Tucker*, 539 F.3d at 552 (ruling that in absence of a "motion or proposed amendments . . . , the district court 'was not required to engage in a guessing game' as to what [the plaintiff] might plead to save her claim" (quoting *Meehan v. United Consumers Club Franchising Corp.*, 312 F.3d 909, 914 (8th Cir. 2002))).

by striking down a Tennessee tax law and Tennessee's provision for state-court review meets the TIA's standard, ICN's claims are barred by the TIA.   And while leave to amend should ordinarily be freely given, the district court did not abuse its discretion in not granting leave when no such leave was requested and conceivable amendments were likely to be fruitless. Accordingly, we **AFFIRM** the district court's judgment.