RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 24a0139p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

UNITED STATES OF AMERICA, et al. *ex rel.* MICHAEL
ANGELO and MSP WB, LLC,

         *Relators-Appellants*,

    v.

ALLSTATE INSURANCE COMPANY, et al.,

         *Defendants-Appellees*.

> No. 23-1196

─────────────────

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:19-cv-11615—Stephen J. Murphy III, District Judge.

Argued:  December 7, 2023

Decided and Filed:  June 27, 2024

Before:  BOGGS, SUHRHEINRICH, and READLER, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:**  J. Alfredo Armas, ARMAS BERTRAN ZINCONE, Coral Gables, Florida, for Appellants.  Linda T. Coberly, WINSTON & STRAWN LLP, Chicago, Illinois, for Insurer Appellees.  Robert C. Folland, BARNES & THORNBURG LLP, Columbus, Ohio, for Appellee Insurance Services Office, Inc.  **ON BRIEF:**  J. Alfredo Armas, ARMAS BERTRAN ZINCONE, Coral Gables, Florida, Shereef H. Akeel, Adam S. Akeel, Samuel R. Simkins, AKEEL & VALENTINE, PLC, Troy, Michigan, John W. Cleary, Ryan H. Susman, MSP RECOVERY LAW FIRM, Coral Gables, Florida, for Appellants.  Linda T. Coberly, WINSTON & STRAWN LLP, Chicago, Illinois, Steven M. Levy, DENTONS US LLP, Chicago, Illinois, Fred K. Herrmann, KERR, RUSSELL AND WEBER, PLC, Detroit, Michigan, for Insurer Appellees.  Robert C. Folland, BARNES & THORNBURG LLP, Columbus, Ohio, for Appellee Insurance Services Office, Inc.  David J. Farber, KING & SPALDING LLP, Washington, D.C., for Amici Curiae.

————————————

**OPINION**

————————————

CHAD A. READLER, Circuit Judge.  Relators allege that Allstate Insurance violated the False Claims Act by skirting its obligations under the Medicare Secondary Payer Act.  After multiple amendments by relators, the district court deemed their second amended complaint deficient in numerous respects and dismissed the case with prejudice.  Because the complaint fails to state a claim for a violation of the False Claims Act, we affirm.

I.

A.  For some incidents, an individual who has incurred medical expenses can lawfully seek recovery from more than one insurer.  Sometimes, those insurers are both private entities.  That is the case, for example, when a car accident victim is entitled to recover medical expenses from both her own auto insurer as well as the other driver's auto insurance carrier.

What happens when one of those insurers is Medicare, the federal health insurance program primarily available to Americans sixty-five or older?  Formerly, whenever Medicare had obligations that overlapped with the obligations of a private insurer, Medicare paid first and let the private insurer pick up any remaining expenses.  Medicare was deemed the "primary" payer, the private insurer the "secondary" payer.  *MSPA Claims 1, LLC v. Tenet Fla., Inc.*, 918 F.3d 1312, 1316 (11th Cir. 2019).

That changed in 1980 with the enactment of the Medicare Secondary Payer Act.  *Humana Med. Plan, Inc., v. W. Heritage Ins. Co.*, 832 F.3d 1229, 1234 (11th Cir. 2016) (citing 42 U.S.C. § 1395y(b)).  To address rising Medicare costs, the Act reversed the primary-secondary order.  It made private insurers the "primary" payer (pay first), and Medicare or a non-governmental Medicare Advantage Organization (MAO) the "secondary" payer (pay only if a balance remains).  *See Bio-Med Applications of Tenn., Inc. v. Cent. States Se. & Areas Health & Welfare Fund*, 656 F.3d 277, 278 (6th Cir. 2011).  Medicare, in other words, became "an

entitlement of last resort, available only if no private [insurer] was liable." *Netro v. Greater Baltimore Med. Ctr., Inc.*, 891 F.3d 522, 524 (4th Cir. 2018) (citation omitted).

In practice, this two-tiered coverage scheme sometimes complicates how medical expenditures are satisfied. Medical bills can mount quickly, yet payments, especially those from private sources, are not always as swift. So Congress created a solution: when the primary payer/plan does not "promptly meet its obligations," Medicare can pay the expenses up front, so long as the primary payer eventually reimburses Medicare for any amounts it overpaid. *See id.* (citing 42 U.S.C. § 1395y(b)(2)(B)). This scenario arises when, for example, a primary payer is contesting its liability to cover an incurred expense. *MSPA Claims 1, LLC v. Kingsway Amigo Ins. Co.*, 950 F.3d 764, 767 (11th Cir. 2020). To ensure that Medicare does, in fact, get reimbursed for payments it fronts for a primary payer, the Medicare Secondary Payer Act authorizes the government to sue the primary payer when the primary payer fails to reimburse the government. *Id.*

One other aspect of this payment structure bears mention. To enhance the likelihood that private insurers satisfy their reimbursement obligations, Congress placed reporting requirements on those insurers. The requirements are found in § 111 of the Medicare, Medicaid, and SCHIP Extension Act of 2007, Pub. L. No. 110-173, 121 Stat. 2492, 2497, codified at 42 U.S.C. § 1395y(b)(7)–(8). Section 111 mandates that private insurers file information regarding Medicare beneficiaries' claims in quarterly reports with the federal Centers for Medicare & Medicaid Services (CMS). The reports must identify those beneficiaries seeking coverage for medical expenses from the private insurer who the insurer has determined may also be covered under Medicare. *See id*. § 1395y(b)(8). Reports must be made "regardless of whether or not there is a determination or admission of liability" by the insurer. *Id.* § 1395y(b)(8)(C). Doing so helps CMS "make an appropriate determination concerning coordination of benefits, including any applicable recovery claim." *Id.* § 1395y(b)(8)(B)(ii). If a private insurer violates § 111, the government can impose "a civil money penalty of up to $1,000 for each day of noncompliance with respect to each claimant." *Id.* § 1395y(b)(8)(E)(i); *see also MSP Recovery Claims, Series LLC v. Hereford Ins. Co.*, 66 F.4th 77, 81–82 (2d Cir. 2023).

B.   This statutory scheme has spawned an industry of compliance, data analytics, and litigation, of which the parties here are emblematic.  Relator MSP WB, LLC is one of several affiliated entities whose business is to "identify violations of Section 111 [to recover] unreimbursed conditional secondary payments."  Appellant Br. at 16.  To do so, MSP WB mines public records and "proprietary" data (e.g., medical liens, police reports, Medicare claims data, hospital records, and litigation documents) to determine whether a Medicare enrollee required medical care and whether the primary payer complied with § 111.  MSP WB then partners with an affiliated law firm to "sue scofflaw primary payers."  *See* 42 U.S.C. § 1395y(b)(3).  A second relator, Michael Angelo, owns and operates a lawyer referral service, as well as health care facilities nationwide, including a medical transportation company, radiology clinics, a pharmacy, and a surgery center.

Turn next to the other side of the caption.  Defendant Insurance Services Office, Inc. (ISO) contracts with insurers to assist with, among other needs, § 111 reporting requirements.  ISO also offers data analytics, compliance, and fraud prevention services.  Consumers of those services are primarily insurance companies, including nearly thirty companies associated with Allstate named as defendants in this proceeding, a group we refer to collectively here as "Allstate."

On behalf of the United States, Michael Angelo and his co-relator filed this qui tam action against defendants, painting in their complaint with a broad brush.  They assert a host of claims, including reverse False Claims Act violations, a conspiracy to violate the False Claims Act, and violations of state false claim laws.  Starting with their substantive False Claims Act theory, relators allege that Allstate failed to report (or inaccurately reported) to CMS information regarding its beneficiaries, in violation of § 111.  Due to those reporting failures, relators say, Allstate either "fail[ed] to provide the government payers with notice of [Allstate's] primary payer obligations" or "den[ied] all liability" in instances where Allstate had primary payer obligations, allowing it to shortchange the government.  This conduct, relators add, resulted in Allstate failing to reimburse Medicare for auto-accident-related medical costs incurred by beneficiaries insured by Allstate, thereby defrauding the government, in violation of the False

Claims Act. Relators further assert that this conduct also constituted a False Claims Act conspiracy and violated state law.

Following relators' filing, a host of procedural developments ensued. The United States declined to intervene. Relators twice amended their complaint, largely echoing in their amended complaints the legal theories underlying the first complaint. Following the filing of the second amended complaint, defendants moved for dismissal under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), asserting pleading defects in the complaint as well as the False Claims Act's public disclosure and first-to-file bars, among other arguments. The district court granted the motions, declined to exercise supplemental jurisdiction over the state law claims, and entered final judgment.

Relators moved for reconsideration, which the district court denied. Next, relators filed a motion to amend or correct under Rule 59(e), asking the district court to amend its judgment to dismiss the case without prejudice to allow relators to file yet another amended complaint. In the alternative, relators moved for relief from judgment under Rule 60(b), asserting that the district court made a legal error by dismissing the complaint with prejudice. The district court denied the motion on both grounds, teeing up relators' appeal. Relators have abandoned the state law claims by failing to challenge the district court's denial of supplemental jurisdiction over those claims in their opening brief on appeal. *See Doe v. Mich. State Univ.*, 989 F.3d 418, 425 (6th Cir. 2021).

## II.

As noted, defendants asserted many grounds for dismissing relators' second amended complaint. Our focus is on relators' failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). *United States ex rel. Harper v. Muskingum Watershed Conservancy Dist.*, 842 F.3d 430, 435 (6th Cir. 2016) (noting that courts of appeal may affirm on any grounds supported by the record). The framework for our review is settled. To state a claim, a complaint must, at a minimum, contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). At the pleading stage, we accept well-pleaded factual allegations (as well as reasonable inferences from those allegations) in the complaint as true, and

we ask whether those allegations make the claims plausible.  *See Patterson v. United HealthCare Ins. Co.*, 76 F.4th 487, 492 (6th Cir. 2023).  We need not credit "a legal conclusion couched as a factual allegation" or a "naked assertion devoid of further factual enhancement."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up).

Also relevant to our review is the fact that the False Claims Act is, at its core, an anti-fraud statute.  Accordingly, relators' complaint must likewise satisfy Federal Rule of Civil Procedure 9(b)'s requirement that fraud be pled with particularity.  *Chesbrough v. VPA, P.C.*, 655 F.3d 461, 466 (6th Cir. 2011); *see also United States ex rel. Ibanez v. Bristol-Myers Squibb Co.*, 874 F.3d 905, 914 (6th Cir. 2017).  We review de novo whether the complaint complied with these Rules.  *See Ibanez*, 874 F.3d at 914.

A.  Relators' claims fall short of these standards.  Start with their substantive False Claims Act counts.  By way of background, most cases brought under the False Claims Act proceed in a similar way:  a relator alleges that the defendant fraudulently sought to obtain overpayment from the government by, for example, making a claim for government payment in an amount greater than what the defendant was entitled to receive.  *See generally* Claire M. Sylvia, The False Claims Act: Fraud Against the Government § 4:2 (Aug. 2023).  Yet Congress has also authorized False Claims Act actions that seek to impose liability for so-called reverse false claims, that is, where a party engages in a false or fraudulent effort to avoid a payment owed to the government.  *See* 31 U.S.C. § 3729(a)(1)(G); *United States ex rel. Barrick v. Parker-Migliorini Int'l, Inc.*, 878 F.3d 1224, 1226 (10th Cir. 2017).  Prototypical reverse false claims include underpayment of rent revenue owed to the United States, understatement of postage or customs duties, underpayment of mineral royalties owed to the federal government, and, as alleged here, avoidance of reimbursement to Medicare.  *See, e.g.*, Sylvia, supra, § 4:18.

Key components of a False Claims Act claim include knowledge and duty.  Anyone who "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government," the statute instructs, is civilly liable.  31 U.S.C. § 3729(a)(1)(G); *see Harper*, 842 F.3d at 436.  To demonstrate as much, relators must plead, with specificity, that Allstate had an "established duty," *see* 31 U.S.C. § 3729(b)(3), which we

have interpreted to mean an "affirmative obligation" "to pay money or property," *Ibanez*, 874 F.3d at 916–17 (citations omitted).  Relators must also demonstrate knowledge, that is, that Allstate knew that it violated its established duty to pay.  *Harper*, 842 F.3d at 437.

1. Relators' claims fail in multiple respects.  Take first the "established duty" requirement.  Relators' theory is that Allstate was a "primary payer" for numerous claims for healthcare costs resulting from car accidents, yet failed to report its "primary payer" status to CMS, leading to Allstate under-reimbursing the federal government for payments previously made by Medicare.  In considering relators' framing of Allstate as a "primary payer," recall the statutory backdrop.  A primary payer obligation arises after Medicare has made a "conditional" (or secondary) payment.  42 U.S.C. § 1395y(b)(2)(B).  Conditional payments by Medicare, in turn, are triggered only where a primary insurer "cannot reasonably be expected to make payment with respect to [an] item or service promptly."  *Id.*  Allstate's obligation as a "primary payer," in other words, arises only once Medicare has made a conditional payment and "it is demonstrated that [Allstate] has or had a responsibility to pay."  *Id.*  From this statutory regime, relators suggest that Allstate insured individuals who were also covered by Medicare, were involved in an auto accident, received medical care, and had their medical expenses covered by Medicare.  Yet, say relators, Allstate left Medicare to foot the bill, pointing to, as evidence, several "exemplars" of Allstate denying claims to Medicare eligible individuals as evidence, as well as Allstate's failure to make § 111 reports  to CMS.

The second amended complaint fails to plead sufficient facts demonstrating as much.  To begin with the exemplars, the complaint lacks detail as to whether and when Allstate incurred an obligation to pay for medical expenses for which it was liable and, relatedly, what conditional payments were made by Medicare to fill that void.  All relators can state with certainty is that Allstate denied one exemplar's claims for insurance benefits.  Relators plead no facts demonstrating that Allstate was responsible for the underlying medical expenses in the first place, let alone facts showing that Medicare made conditional payments for those expenses.  In theory, relators' assertions could have merit.  But we require more than theoretical musings. Without identifying with particularity a concrete, existing duty to pay money or property owed to the United States, relators' allegations amount to little more than a "formulaic recitation of the

elements of a cause of action" coupled with the controlling statutory scheme. *See Ibanez*, 874 F.3d at 917 (citing *Bell Atlantic Corp., et al. v. Twombly*, 550 U.S. 544, 555 (2007)). That is insufficient to state a claim.

An exemplar in the second amended complaint demonstrates these deficiencies. There, relators allege that E.A., a Medicare beneficiary, was a pedestrian injured in a car accident. Following the accident, E.A. was assigned to Allstate to cover his no-fault related injuries, pursuant to Michigan law. E.A., the complaint adds, received prescription medication that was eventually paid for by Medicare, yet Allstate never reported E.A.'s identity and claims to CMS. Absent here are sufficient allegations that Allstate actually owed an obligation to the government regarding E.A. For instance, we do not know whether the medication paid for by Medicare was tied to accident-related injuries. Nor do we know that Allstate was obligated to make a payment on E.A.'s behalf. *See, e.g.*, 7 Blashfield Automobile Law and Practice § 272:13 (Aug. 2023); Michigan Dep't of Ins. & Fin. Servs., *Brief Explanation of Michigan No-Fault Insurance* (July 2020), [https://perma.cc/TDC3-3Z59]. And even if it were, we do not know that Allstate did not honor its obligation, or that it could not "reasonably be expected" to do so. *See* 42 U.S.C. § 1395y(b)(2)(B)(i). All of these questions need answers before relators can show plausibly that Allstate was the primary payer, yet failed to make reimbursement payments to Medicare.

Nor can we credit relators' allegations that Allstate failed to comply with § 111's reporting requirements, thereby violating a duty owed to the government. According to relators, Allstate makes "systematic" reporting "failures" by "intentionally miss[ing] critical data fields" about beneficiaries while "certify[ing] to the government that they are in compliance with their reporting obligations." Setting aside the fact that relators have not put forward well-pleaded allegations of insufficient § 111 reports, even had they done so, those allegations would not necessarily show an "obligation" by Allstate to pay money. Return to the statutory puzzle and consider how § 111 fits in. Congress enacted that provision to require insurers to file quarterly reports to CMS identifying those policyholders seeking coverage for medical expenses who are also Medicare beneficiaries. *See* 42 U.S.C. § 1395y(b)(7)–(8). The reports must list all claimants whose claims are unresolved, "regardless [of whether] there is a determination or admission of liability." *Id.* § 1395y(b)(8)(A)–(C).

Fatal to relators' theory is the fact that a § 111 report alone is not a reliable indicator of whether Medicare has made a conditional payment on a beneficiary's behalf. Those reports do not indicate, with any particularity, that an insurer has a financial obligation to the government. After all, § 111 reports must be made "regardless" of the insurer's liability. *See id.* § 1395y(b)(8)(C). In other words, insurers file the reports even when it has not been established that the insurer is the "primary payer." For example, an insurer may make such a filing before there is a finding of liability on the insurer's part regarding the incident giving rise to the claim. Or it may do so where a Medicare beneficiary is treated for medical concerns that are ultimately deemed unrelated to the accident giving rise to the insurer's liability. In those situations, a "belt and suspenders" report of a claim by Allstate to CMS does not show that a conditional payment has been made.

Consider relators' allegations pertaining to Exemplar K.S. Following a car accident, K.S. allegedly received medical care paid for by a private MAO health plan. As a threshold matter, we note our sister circuits' concerns with assigning False Claims Act liability for payments owed to MAOs, which are private entities, and not the government. *See United States ex rel. Petras v. Simparel, Inc.*, 857 F.3d 497, 504 (3d Cir. 2017); *United States ex rel. Adams v. Aurora Loan Servs., Inc.*, 813 F.3d 1259, 1260–61 (9th Cir. 2016). But even setting that matter to the side, this exemplar is flawed. According to relators, Allstate allegedly covered K.S. via a no-fault policy and reported this claim to ISO—its compliance consultant. To relators, this indicates that Allstate was the "primary payer," yet failed to reimburse the MAO. Here too, relators fail to include details about Allstate's obligations giving rise to its purported status as a "primary payer." *See United States ex rel. Prather v. Brookdale Senior Living Communities, Inc.*, 838 F.3d 750, 771 (6th Cir. 2016) ("Rule 9(b)'s particularity rule serves an important purpose in fraud actions by alerting defendants to the precise misconduct with which they are charged and protecting defendants against spurious charges of immoral and fraudulent behavior." (cleaned up)). As already explained, for a variety of reasons, "an insurer's report under Section 111 does not admit the insurer's liability for the claim reported." *Hereford Ins. Co.*, 66 F.4th at 87. And here, it bears adding, we are one step further removed. Relators' allegation centers on a report

made to ISO, not CMS.  If a § 111 report to CMS does not itself demonstrate liability, certainly a report made to a private entity for compliance purposes does not either.

2. Nor have relators demonstrated Allstate's understanding that its conduct violated its obligations under federal law.  One who "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government" runs afoul of the False Claims Act.  31 U.S.C. § 3729(a)(1)(G).  Knowledge "refer[s] to a defendant's awareness of *both* an obligation to the United States *and* his violation of that obligation." *Harper*, 842 F.3d at 436.  While Rule 9(b) permits knowledge to be averred generally, we must be satisfied that the alleged factual basis gives rise to a strong inference of fraudulent intent.  *See Chesbrough*, 655 F.3d at 470–71; Fed. R. Civ. P. 9(b).

We vigorously enforce the False Claims Act's knowledge requirement.  Take *Harper*, for example.  842 F.3d at 438.  There, property was deeded to Muskingum Watershed Conservancy District, a political subdivision in Ohio, to be used for recreation, conservation, and reservoir development. *Id.* at 432, 434.  The deed contained a reverter clause providing for the return of the property to the federal government if the District alienated the property. *Id.*  Decades later, the District entered into a series of leases conveying mineral rights to various businesses for the purpose of conducting horizontal hydraulic fracturing, also known as fracking. *Id.*  Two relators filed a qui tam action under the False Claims Act, claiming that the leases had the effect of alienating the property, thereby triggering the reverter clause and entitling the federal government to immediate possession of the lands.  Relators alleged that the District, by failing to return the property and by retaining the proceeds of the leases, violated the False Claims Act. *Id.* We disagreed on the basis that relators failed to plead the District's knowledge adequately.  As we explained, it is not enough that a defendant was aware of an obligation; rather, it must also have been aware that its actions violated that obligation. *See id.* at 437–38.  And there, the complaint did not demonstrate "how [the District] would have known that the fracking leases violated the deed restrictions." *Id.* at 438.

Relators' second amended complaint falls well short of this standard.  With respect to the exemplars, we cannot accept the bare use of the terms "knowingly" or "knowledge" without

evidence of what information Allstate knew, and when and how it knew it.  *See Harper*, 842 F.3d at 438.  As to K.S., for example, relators state that Allstate reported K.S.'s accident to ISO, yet "failed to reimburse" Medicare for K.S.'s claim.  Even taking these assertions as true, relators do not explain how and when Allstate was aware of any conditional payments made by Medicare on K.S.'s claim, let alone that Allstate knowingly evaded its duty to pay.  In short, without a well-pleaded allegation of an obligation owed to the government, let alone one knowingly shirked, relators have not stated a claim for relief.  *See Harper*, 842 F.3d at 438 ("Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown— that the pleader is entitled to relief." (cleaned up)).

B.  Relators' claim for conspiracy fares no better.  The False Claims Act imposes liability for conspiracies to violate the statute's terms.  31 U.S.C. § 3729(a)(1)(C).  As with any conspiracy, there must be plausible facts alleging an agreement.  *See Ibanez*, 874 F.3d at 917.  Critically, "it is not enough for relators to show there was an agreement that made it *likely* there would be a violation of the FCA; they must show an agreement was made *in order to* violate the FCA."  *Id.*  And once again, relators must do so in accordance with Federal Rules of Civil Procedure 8 and 9(b).  *See United States ex rel. Marlar v. BWXT Y-12, LLC*, 525 F.3d 439, 446 (6th Cir. 2008).  Their complaint, taken as true, must be "plausible on its face," *Twombly*, 550 U.S. at 570, and must "state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b); *see Iqbal*, 556 U.S. at 678; *United States ex rel. Bledsoe v. Cmty. Health. Sys., Inc.*, 501 F.3d 493, 504, 510 (6th Cir. 2007).  That is, relators must allege who was party to the agreement, how the agreement was reached, when the agreement was reached, and what were its terms.  *See Sanderson v. HCA-The Healthcare Co.*, 447 F.3d 873, 877 (6th Cir. 2006) (explaining that "at a minimum, Rule 9(b) requires that the plaintiff specify the 'who, what, when, where, and how' of the alleged fraud" (cleaned up)).

Relators assert that Allstate conspired with ISO and others to "defraud" Medicare by "failing to provide coordination of benefits data and other information."  All seem to agree that Allstate and ISO had a contractual relationship to aid Allstate in filing § 111 reports to CMS.  According to relators, that contractual relationship furthered an effort "to evade [Allstate's

§ 111] reporting requirements and obligations to reimburse the government." Allstate's and ISO's alleged coordinated efforts included "providing boilerplate false and misleading information" to CMS and "purposefully withholding pertinent data and other information." From this purported scheme, Allstate was able to obscure its primary payer responsibilities and decrease or avoid its payment obligations.

In *Ibanez*, we dismissed a False Claims Act conspiracy claim that alleged two pharmaceutical companies schemed to promote a prescription medication improperly. There, the relators failed to plead a "specific statement showing the plan was made *in order to defraud* the government." 874 F.3d at 917 (emphasis added). Yes, we acknowledged, it may have been "foreseeable that somewhere down the line" a medically unnecessary, fraudulent prescription would be submitted to the government for payment. *Id.* But without facts demonstrating "a plan to get false claims paid," the allegations failed. *Id.* To our eye, the "chain" connecting the "alleged misconduct to the eventual submission of false claims to the government" was "unusually attenuated." *Id.* That attenuation, coupled with "relators' failure to adequately plead a violation of any other section of the FCA, render[ed] insufficient the otherwise bare allegation that there was an FCA conspiracy." *Id.* (citing *Twombly*, 550 U.S. at 556).

So too here. As we have already discussed, relators failed to adequately plead a substantive False Claims Act violation. Nor was there an agreement to violate the False Claims Act. *See* 31 U.S.C. § 3729(a)(1)(C). Relators characterize the ISO/Allstate relationship as nefarious because it allowed the two to "share[] in the general conspiratorial objective of defrauding [Medicare] using false statements in [Allstate's §] 111 Reports." Yet relators fail to provide any specific details regarding this alleged plan or an agreement to execute the plan. Conclusory allegations that "[d]efendants engage[] in a concerted scheme" and "plan[] to knowingly conceal and knowingly and improperly avoid or decrease their obligations" simply repackage the elements of a False Claims Act conspiracy. By and large, that manner of pleading reflects the attenuation we identified in *Ibanez* as dooming a False Claims Act conspiracy claim. *See* 874 F.3d at 917.

True, as relators emphasize, a contract existed between defendants. Allstate contracted with ISO, who maintains a database of insurance claim information, for assistance with § 111 reporting. Relators' theory boils down to a basic assumption that whoever contracted with Allstate on § 111 matters must have been in cahoots with Allstate. But a contractual relationship alone does not suggest collusion any more than it suggests a legitimate business relationship. *See Twombly*, 550 U.S. at 553–54 ("The inadequacy of showing parallel conduct or interdependence, without more, mirrors the ambiguity of the behavior . . . ."). To relators, if Allstate contracts with ISO for § 111 reporting requirements yet fails to abide by those requirements, the obvious conclusion is that defendants together conspired to defraud the government. We disagree. That conclusion is not just a stretch—it is wholly unsubstantiated.

Relators respond by pointing us to their proposed third amended complaint. It does not save their day. The proposed amendment was filed in February 2023, nearly a month after judgment was entered, and even then only as an appendix to relators' motion under Rules 59(e) and 60(b). The document was not accepted by the district court, and we will not consider it here. *See Berry v. U.S. Dep't of Labor*, 832 F.3d 627, 637–38 (6th Cir. 2016) (explaining that on a motion to dismiss, "our review is typically limited to the complaint's allegations . . . [and] materials attached to a motion to dismiss if they are referred to in the complaint and central to the claim").

### III.

Failing elsewhere, relators say the district court erred in denying them leave to amend their complaint again, and then compounded that error by denying them reconsideration. Not so.

Generally, we review a district court's denial of leave to file an amended complaint for abuse of discretion. *Islamic Ctr. of Nashville v. Tennessee*, 872 F.3d 377, 387 (6th Cir. 2017). We do the same in evaluating the district court's denial of a motion for reconsideration. *In re Greektown Holdings, LLC*, 728 F.3d 567, 573 (6th Cir. 2013). A district court abuses its discretion when it relies upon clearly erroneous factual findings, improperly applies the law, or uses an erroneous legal standard. *Bisig v. Time Warner Cable, Inc.*, 940 F.3d 205, 218 (6th Cir. 2019). Before reversing, we must be left with a "definite and firm conviction that the [district]

court committed a clear error in judgment." *Cummins v. BIC USA, Inc.*, 727 F.3d 506, 510 (6th Cir. 2013) (citation omitted). Relators are correct to note that we employ de novo review where a district court's decision was based on the "legal conclusion that an amended complaint could not withstand a motion to dismiss." *Morse v. McWhorter*, 290 F.3d 795, 799 (6th Cir. 2002). But the district court's decision was not that. *See Cummins*, 727 F.3d at 510. Instead, the court denied leave to amend because relators' late-stage motion was evidence of their bad faith and delay tactics. So we review for an abuse of discretion.

In so doing, it bears repeating the complex procedural path this case traveled in the district court, traversing multiple sections of the Federal Rules of Civil Procedure. After twice amending their complaint under Rule 15 and seeing their second amended complaint dismissed in accordance with Rule 12(b)(6), relators moved for reconsideration, which the district court denied. Next, relators filed a motion to amend under Rule 59(e), asking the district court to dismiss the case without prejudice to allow them to file yet another amended complaint. In the alternative, relators sought relief from judgment under Rule 60(b)(1) because, in their view, the district court made a mistake by dismissing their claims with prejudice. The district court denied the motion in all respects, concluding that leave to amend the complaint for a third time was not justified and that dismissal with prejudice was appropriate.

We are not left with the "definite and firm conviction" that the district court erred in denying relators what was essentially a fourth bite at the apple. For good reason, matters like leave to amend typically are left to the district court's discretion. *Leary v. Daeschner*, 349 F.3d 888, 905 (6th Cir. 2003) (explaining *Foman v. Davis*, 371 U.S 178, 182 (1962)). Here, despite facing motions to dismiss from all defendants, relators failed to file a motion for leave to amend their operative complaint. The district court in turn dismissed the complaint with prejudice. Doing so where a plaintiff has not sought leave to amend typically is not an abuse of discretion. *United States ex rel. Harper v. Muskingum Watershed Conservancy Dist. (Harper II)*, 739 F. App'x 330, 334–35 (6th Cir. 2018); *accord Justice v. Peterson*, No. 21-5848, 2022 WL 2188451, at *4 (6th Cir. June 17, 2022). That is all the more true when, as here, relators failed to file their proposed amended complaint until after judgment was entered. *Ohio Police & Fire Pension Fund v. Standard & Poor's Fin. Servs. LLC*, 700 F.3d 829, 844 (6th Cir. 2012).

While leave to amend should be "freely given," it is not merely a formality, especially in the event of "undue delay, bad faith or dilatory motive on the part of the movant," or "repeated failure to cure deficiencies by amendments previously allowed." *Leary*, 349 F.3d at 905 (quoting *Foman*, 371 U.S. at 182)). Those criticisms fairly describe relators' belated request for leave. *Morse*, 290 F.3d at 800. Their proposed third amended complaint would have been the fourth complaint filed in this action, and the second amendment made after defendants moved to dismiss. Despite sufficient opportunity, relators did not formally seek leave to amend before the entry of judgment. This is, at the very least, dilatory. The district court found relators' belated motion "reminiscent of the notorious litigation strategy employed by other MSP entities with which [MSP WB] is affiliated." Borrowing a quotation from another district court, the district court here observed "that 'enough is enough . . . [f]ederal court is not a sounding board for litigants to test various theories until they find one allowing the litigation to continue.'" R.111, PageID 3422 (quoting *MAO-MSO Recovery II, LLC v. State Farm Mut. Auto Ins.*, No. 1:19-cv-1537, 2019 WL 6311987, at *10 (C.D. Ill. Nov. 25, 2019)). Our pleading rules—and the district court's discretion to administer them—exist to keep litigants from sandbagging their opponents until they are on notice of what their allegations lack. On that score, we see no basis to question the district court's assessment.

Relators point us to *Newberry v. Silverman*, 789 F.3d 636 (6th Cir. 2015). There, the plaintiff submitted a ten-page affidavit in opposition to the motion to dismiss that contained "significantly greater detail" than did the complaint, leading us to conclude that the district court should have dismissed "without prejudice and with leave to amend." *Id.* at 645–46. The same is not true for relators. Their proposed third amended complaint arrived only after multiple rounds of amendment and motion practice. The district court rejected it on that basis—not due to an assessment of whether the new allegations would have been sufficient to state a claim. Relators, in short, have had ample opportunity to test their allegations.

\*     \*     \*     \*     \*

For the foregoing reasons, the judgment of the district court is affirmed.